JOURNAL ENTRY OPINION
{¶ 1} Defendant-appellant Sysco Food Services of Cleveland, Inc. ("Sysco") appeals from the judgment of the lower court that granted plaintiff-appellee Eugene Thornton's ("Thornton") motion for a new trial in this workers' compensation case. Sysco further challenges certain rulings made by the lower court at trial. For the reasons that follow, we affirm in part; reverse in part and remand with instructions.
 {¶ 2} Thornton was working at Sysco on January 1, 2001. Thornton's job as an order selector required him to operate a motorized pallet jack to move containers of food from shelves in a warehouse. The shelves rest on metal uprights. He arrived at work between 6:00 p.m. and 6:30 p.m. on January 1, 2001. Thornton testified that around 8:00 p.m., when he was attempting to pass another machine with his pallet jack, his left foot was slightly slanted off his pallet jack and got caught between the pallet jack and the steel uprights on the shelving. He felt pain in his foot but tried to keep working.
 {¶ 3} During cross-examination, Thornton admitted that it was possible that he either hit his foot head-on or on the side because he was not looking at his feet at the time. When asked if his foot was "wedged into anything" Thornton responded: "Wedged? It was caught for a few seconds. I mean, I'm trying to answer your question the best way I can." (Tr. 124).
 {¶ 4} His foot felt completely numb and estimates that he was taken to the dispensary by a coworker within 15 minutes of the incident. On his way to the dispensary, Thornton stopped to talk with his supervisor, Chris Thomas. Thomas told Thornton that if he had injured himself at work he would have to take a drug test but if the injury occurred outside of work he would not be drug tested. Sysco's rules provide for discharge in the event an employee tests positive for drugs. Thornton said he was worried about losing his job because he was still in his probationary period and did not think that his injury would be too significant, so he decided to tell the nurse that he hurt himself at home. Thornton told the nurse that he dropped a dresser on his foot. Thornton arrived at the dispensary at 8:30 p.m.
 {¶ 5} When the nurse removed his sock, Thornton saw his grotesque injuries that are depicted in Plaintiff's Exhibits 1 and 2. A coworker took Thornton to the hospital. Thornton described himself as delirious after he saw the injury and was screaming, crying, and cussing.
 {¶ 6} After speaking with his mother, Thornton says he decided to tell the truth of how his injury occurred at work. He told Dr. Halpert that it happened at work. Dr. Halpert was aware of Thornton's differing accounts about how he sustained his foot injury.
 {¶ 7} Ultimately, half of Thornton's left big toe was amputated and his left second toe was completely amputated.
 {¶ 8} Thornton admits to drinking alcohol and smoking marijuana on New Year's Eve, the night before his injury. He denied feeling any effects from anything he had done the night before when he arrived at work the next day. The nurse who treated Thornton testified that he did not appear to be in any way under the influence of drugs or alcohol. There is no testimony that Thornton appeared under the influence of drugs or alcohol while he was at work on January 1, 2001.
 {¶ 9} Dr. Halpert testified that when he arrived at the hospital on January 1, 2001 he was told that Thornton had dropped furniture on his foot. But, when Dr. Halpert saw the injury to Thorton's second toe, which was in an upward position, he questioned the validity of that account of the accident. Subsequently, he learned of Thornton's later account that it was a work-related injury.
 {¶ 10} Dr. Halpert saw photographs of the equipment and the "scenario where it was at." Dr. Halpert felt his opinion would be helpful towards ascertaining which of Thornton's versions was more probably the cause of his injuries. Dr. Halpert related why Thornton's initial account — that he dropped something on his foot hours before reporting the incident — was not consistent with his injuries. Halpert opined, among other things, that there would probably have been more blood in the shoe if he had injured it at home at 5:30 p.m. and walked around on it until 8:15 p.m.
 {¶ 11} Dr. Halpert's understanding of the work related injury was that Thornton's "foot kind of wedged between the rack and the platform on the machine." (Tr. 32). It was Halpert's opinion "within reasonable podiatric certainty or probability" that Thornton injured his foot at work rather than at home under the differing scenarios described. This is because "the deformity of the second toe does not make sense from dropping a heavy object from top to bottom"; there would have been more blood in the shoe if Thornton walked around on the injured foot for two to three hours; and the average person would not ignore such a severe injury for that long (three hours). (Tr. 52).
 {¶ 12} In clarifying Halpert's response, plaintiff's counsel further questioned "we're not interested in possibilities * * * I want to make certain there is no mistake about what your answer was. * * * are you able to say that one of them is more medically supported than the other, and if so, which one is it?" (Tr. 54). Halpert responded, "I would put more toward work related * * *." (Tr. 55).
 {¶ 13} On cross-examination, Halpert responded affirmatively to the question that "it's more likely that [a degloving injury] would happen [with the flesh trapped by something and the foot being pulled back] than with a straight on hit." (Tr. 80). But, Halpert also said it was possible to have that type of injury with a straight-on hit if there was a lot of force pushing the foot up. Defense counsel asked Halpert certain questions about the effects of marijuana on pain sensation but nothing relative to the correlation between drug use and the cause of Thornton's injuries. There was no evidence that Thornton's injuries resulted from him being under the influence of drugs or alcohol.
 {¶ 14} The court instructed the jury on the law including that "an injury does not arise out of employment when the injury occurred while the employee was so intoxicated that he could not perform his job or services" and that they were to determine, among other things, "whether the proximate cause of [Thornton's] injuries was his voluntary [sic] being under the influence of drugs." The term "proximate cause" was also defined for the jury. The court presented the jury with three interrogatories and the verdict form. The jury had a question about the third interrogatory, which read as follows:
 {¶ 15} "If your answer to Interrogatory Number 2 was yes; do you find from the evidence and by a preponderance thereof that plaintiff's partial amputation left big toe and amputation left second toe occurred in the course of his employment with defendant Sysco or was it taken out of the course of his employment by reason of his voluntarily being under the influence of drugs, which voluntary intoxication proximately caused his injuries." (Tr. 338, 343). The jury was given the choice to answer that interrogatory "YES, it was in the course of his employment with SYSCO" or "NO, it was not in the course of his employment with SYSCO." The jury did not appear to understand how to answer this disjunctive interrogatory with a yes or no answer. (Tr. 346). The foreman inquired as to whether their sole choices in responding to the multifaceted interrogatory were yes and no. The foreman further inquired as to what answering "yes" meant. The court responded that "yes" meant "was it in the course of his employment with Sysco. Yes means that he was doing his job and his job that he was employed by Sysco and that he was competent to do it, that his ability to do his job had not been influenced or affected by any intoxication to the extent that he couldn't do the job."
 {¶ 16} The foreman then inquired "[t]he answer no would mean he wasn't competent to do his job?"
 {¶ 17} The court instructed that "[t]he answer no would mean he really wasn't doing his job because he was too intoxicated to do it because — for him to receive your verdict he had to have been within the course and scope of his employment; that is, ready, willing, and able to do his job competently, okay." (T. 345-346).
 {¶ 18} Interrogatory number 3 was impossible to answer with a yes or no. The court instructed the jury that to answer yes meant that Thornton was capable of doing his job competently and to answer no would mean that he was not. There was no further instruction on the matter of proximate cause or that it had to not only find that Thornton was intoxicated but also had to find that the injuries proximately resulted from the intoxication.
 {¶ 19} Seven of the eight jurors found that Thornton's injury was directly and proximately caused by an at-work accident. Nonetheless, six of the eight jurors responded negatively to interrogatory number three and found that Thornton was not entitled to participate in the benefits of the Workers' Compensation Fund.
 {¶ 20} Plaintiff filed a motion for judgment notwithstanding the verdict or new trial. The court granted plaintiff's motion for new trial without providing any grounds or reasons. Sysco appeals assigning four assignments of error that we will address in the order asserted and together where appropriate for discussion.
 {¶ 21} "I. The trial court erred to the prejudice of the defendant-appellant when it overruled defendant-appellant's objections to and motion to strike the opinion testimony of Dr. Jeffrey A. Halpert offered in plaintiff-appellee's case-in-chief."
 {¶ 22} "II. The trial court erred to the prejudice of defendant-appellant when it denied defendant-appellant's motion for a directed verdict made at the conclusion of the plaintiff's case-in-chief and renewed at the conclusion of all of the evidence."
 {¶ 23} At the close of plaintiff's case-in-chief and at the close of evidence, Sysco moved the court for a directed verdict asserting that plaintiff's expert (Halpert) lacked an accurate history upon which to predicate his expert opinion. Sysco also essentially maintained that Halpert's testimony did not establish the cause of the injury with the requisite degree of certainty. The court denied the motion and renewed motion for directed verdict.
 {¶ 24} The appellate court conducts a de novo review of a judgment on a motion for directed verdict. Howell v. Dayton Power Light Co.
(1995), 102 Ohio App.3d 6, 13. Civ.R. 50(A)(4) sets forth the standard for granting a motion for directed verdict as follows:
 {¶ 25} "When a motion for directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."
 {¶ 26} Under this standard, the court must not only construe all direct and positive evidence in a light most favorable to the non-moving party, but also must give the non-moving party the benefit of all "reasonable inferences" that may be drawn from the evidence. Rinehart v.Toledo Blade Co. (1985), 21 Ohio App.3d 274; see, also, Broz v. Winland
(1994), 68 Ohio St.3d 521, 526.
 {¶ 27} Where there is competent evidence favoring the nonmoving party so that reasonable minds might reach different conclusions, the motion must be denied. Ramage v. Cent. Ohio Emergency Serv., Inc. (1992),64 Ohio St.3d 97. Even where there is voluminous evidence in the record to support a verdict for the moving party, a motion for directed verdict is improper where there is also adequate evidence to enable reasonable minds to find for the non-moving party. Gliner v. Saint-Gobain NortonIndus. Ceramics Corp. (2000), 89 Ohio St.3d 414, 415, citing O'Day v.Webb (1972), 29 Ohio St.2d 215, paragraph four of the syllabus; seePangle v. Joyce (1996), 76 Ohio St.3d 389, 391, 667.
 {¶ 28} Sysco asserts that Halpert based his opinion that Thornton's injuries were more consistent with the work-related version than the home-related version of the incident on facts not in the record and/or on an inaccurate history of the work related incident reported by Thornton. We disagree. When construed as a whole, Halpert's basis for his opinion was not inconsistent with Thorton's version of the at-work incident. Thornton described that his foot was slightly off the pallet jack platform, that he was not looking at his foot at the time; and that his foot was caught for a few seconds or possibly hit and bounced off the racks. Ibid. Accordingly, we find that Halpert's testimony was based on facts or data admitted into evidence in compliance with Evid.R. 703.
 {¶ 29} Evid.R. 702 provides:
 {¶ 30} "A witness may testify as an expert if all of the following apply:
 {¶ 31} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 32} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 33} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 {¶ 34} "(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 {¶ 35} "(2) The design of the procedure, test, or experiment reliably implements the theory;
 {¶ 36} "(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."
 {¶ 37} We have previously held that "`the reliability requirement in Evid.R. 702 is a threshold determination that should focus on a particular type of scientific evidence, not the truth or falsity of an alleged scientific fact or truth.' Id. Further, when `reviewing a summary judgment motion, a trial court should not reject one expert opinion or another simply because it believes one theory over the other.' Miller,80 Ohio St.3d at 613-614." Smith v. Dillard's Dept. Stores, Inc. (Dec. 14, 2000), Cuyahoga App. No. 75787. This should apply with equal force when a court is faced with a motion for directed verdict on a record that presents conflicting expert opinions.
 {¶ 38} Lastly, Sysco contends that Halpert's testimony was not stated in terms of the requisite probability as contemplated by the Ohio Supreme Court in Stinson v. England (1994), 69 Ohio St.3d 451, paragraph 2 of the syllabus. Other Ohio courts have held that "an expert's testimony that did not establish the cause of injury but refuted the plaintiff's theory of causation was admissible." Wissing v. D.F. Electronics, Inc. (Sept. 26, 1997), Hamilton App. No. C-950915 [citation omitted].
 {¶ 39} As set forth above, Dr. Halpert stated his opinion within reasonable podiatric certainty or probability that the injuries at issue most probably occurred in the work-related incident described by Thornton. Halpert also explained why the injuries were inconsistent with the home incident that Thornton originally reported. Just because an expert may concede other possible causes of an injury this does not mean the expert cannot opine as to the more probable cause of an injury with the requisite degree of certainty.
 {¶ 40} We find that the trial court did not err in denying the motion for directed verdict. Assignments of Error I and II are overruled.
 {¶ 41} "III. The trial court erred to the prejudice of defendant-appellant in granting plaintiff's motion for a new trial.
 {¶ 42} "IV. The trial court erred to the prejudice of defendant-appellant in failing to specify in writing the grounds upon which the new trial was granted."
 {¶ 43} Civ.R. 59 provides in relevant part as follows:
 {¶ 44} "(A) Grounds
 {¶ 45} "A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:
 {¶ 46} "* * *
 {¶ 47} "When a new trial is granted, the court shall specify in writing the grounds upon which such new trial is granted * * *"
 {¶ 48} The trial court must state the basis in order to enable the reviewing court to determine whether there was an abuse of discretion in granting the motion. Antal v. Olde Worlde Products, Inc. (1984),9 Ohio St.3d 144, limited by Mannion v. Sandel (2001), 91 Ohio St.3d 318. "Absent the trial court's specific reasoning for granting the motion for new trial, this court is precluded from critically reviewing the propriety of the trial court's decision to grant a new trial." Johnson v.University Hospitals of Cleveland (July 12, 1990), Cuyahoga App. No. 57100.[1] In Johnson, we remanded the matter for reconsideration of the motion for new trial. Id.; accord Winson v. Fauth (1989),63 Ohio App.3d 738 (remanded to the trial court for the court to explain the reasoning behind its decision to grant a new trial).
 {¶ 49} Although the trial court granted plaintiff's motion for new trial it did not specify the grounds. Therefore, Assignments of Error III and IV are sustained in part and the matter is remanded to the trial court to state its grounds for granting the motion for new trial.
 {¶ 50} Judgment affirmed in part; reversed in part and remanded with instructions.
It is ordered that appellant and appellee share equally the costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Kilbane, P.J., Concurs.
 McMonagle, J., Concurs.
[1] The court in Johnson issued the announcement of the court's decision on June 21, 1990 and ordered the jury verdict reinstated. Subsequently, appellee's motion to reconsider was granted. Accordingly, Sysco's reliance on this decision as initially announced is misplaced.